IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 7 |
| THOMAS EDMUND HILDRETH, | * | |
|     Debtor | * | CASE NO: 1:09-bk-09029 MDF |
| | * | |
| GREGORY SCOTT WHITEFORD, | * | ADV. NO: 1:10-ap-00158 MDF |
|     Plaintiff | * | |
| | * | |
| v. | * | |
| | * | |
| THOMAS EDMUND HILDRETH, | * | |
|     Defendant | * | |
| | * | |

**OPINION**

Before the Court is the Complaint filed by Gregory Scott Whiteford ("Whiteford") objecting to the discharge of a debt owed to him by Thomas Edmund Hildreth ("Debtor") based on a loan transaction entered into by the parties on August 15, 2007. In his Complaint, Whiteford alleges that the debt was incurred through false representations and, thus, must be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B). For the reasons discussed below, the Court finds that the debt is excepted from discharge under § 523(a)(2)(A).[1]

**I. Procedural History**

Debtor filed the instant Chapter 7 bankruptcy petition on November 20, 2009. Whiteford is listed as a creditor with a secured claim against Debtor's residence by virtue of a third

---

[1] Although not stated explicitly by the parties, I find that the case was tried under § 523(a)(2)(A) rather than § 523(a)(2)(B). An issue may be tried by implied consent for purposes of Fed. R. Civ. P. 15(b)(2) (Fed. R. Bank. P. 7015), if: (1) the parties recognized that the unpleaded issue became part of the case at trial, (2) the evidence supporting the unpleaded issue was introduced at trial without objection, and (3) the opposing party's opportunity to respond was not prejudiced by a finding of trial by consent. *Foraker v. Chaffinch,* 501 F.3d 231, 244-46 (3d Cir. 2007).

mortgage recorded against the property. The value of the residence is listed at $231,400, with a first mortgage of $276,000 and a second mortgage of $29,990. Whiteford's claim is valued at $102,500.

On April 27, 2010, Whiteford filed the instant adversary case seeking a declaration that his claim against Debtor should be excepted from discharge under 11 U.S.C. § 523(a)(2)(B). Debtor filed an Answer to the Complaint and a trial was held on October 28, 2010. The matter is ready for decision.[2]

## II. Factual Findings

Since 1976, Whiteford has operated G.S. Whiteford Co., a retail establishment in Whiteford, Maryland selling beer, liquor, soft drinks, cigarettes, and other sundry items. In addition to his retail operation, Whiteford also cashes checks, including personal, payroll, and government checks. For each check cashed, Whiteford retains a fee of three percent (3%) of the face amount.

Prior to filing the instant Chapter 7 bankruptcy, Debtor operated T&T Painting and Drywall, Inc. ("T&T"), a home improvement business, out of his residence. On the date he filed his petition, Debtor resided at 235 South Market Street, Fawn Grove, Pennsylvania.

Between 2004 and 2007, Whiteford often cashed checks for Debtor and T&T. Some of the checks were drawn on Debtor's personal or business bank accounts; other checks were payable to Debtor or T&T and endorsed over to Whiteford. Whiteford estimates that between 2004 and 2007, he cashed checks worth approximately $1 million for Debtor or T&T. During

---

[2]This Court has jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A), (I) and (O). This Opinion constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure 7052.

the same period, twenty-three checks cashed for Debtor or T&T were returned to Whiteford due to insufficient funds in the maker's account. Debtor provided funds to make good on all the checks cashed except for the last check presented, which eventually was rolled into a term loan.

In addition to cashing checks, Whiteford also loaned Debtor money on several occasions on a secured basis, often at exorbitant rates. In March 2006, Debtor asked Whiteford to loan him $25,000, which was to be paid when a lot owned by Debtor's son was sold. Debtor's son executed a note and mortgage in favor of Whiteford that provided for payment of the note by June 22, 2006 along with $5000 in interest. Under the terms of the note, if the balance was not paid by the due date, Debtor's son was obligated to make additional payments of $500 per month until the loan was paid in full. Although the loan was the obligation of Debtor's son, Debtor made the additional payments under the note until it was paid in full. The mortgage securing the loan was satisfied in August 2006.

On January 5, 2007, Debtor delivered to Whiteford a handwritten request for a loan in the amount of $8754. On this date Debtor owed Whiteford $11,246.64 for a check previously cashed for Debtor that had been returned for insufficient funds. When Debtor requested the $8754 loan he stated that he would repay a total amount of "$22,500 by February 1st or interest [of] [$]500.00 a month if not paid by Feb 1st 2007." (Whiteford Exhibit 4).[3] Whiteford granted the loan request (hereinafter, "the January 2007 Loan") and obtained possessory liens on a boat

---

[3] The Court deduces that Debtor was rolling the outstanding check into a new loan for $22,000, which included new advances of $8754. Because the original loan term was only one month, the total amount due on February 1, 2007 was the principal balance of $22,000 plus interest of $500.

3

and two trucks. Although Debtor did not pay the loan in full in February, 2007, he did make interest payments of $500 per month until August, 2007.

On August 13, 2007, Debtor directed Robert Tarbert ("Tarbert"), an employee of T&T, to deliver to Whiteford another written request for a loan. This solicitation, in the form of a letter handwritten by Debtor on two pages of yellow, lined paper, requested $80,000. The letter acknowledged an outstanding debt of $22,500 from the January 2007 Loan, which when added to the requested loan would result in a consolidated debt of $102,500. In the letter, Debtor promised to repay Whiteford $110,000 upon the sale of his Fawn Grove residence, which he stated was listed with a realtor. Debtor represented that the asking price for his residence was $629,900, that there existed a "current mortgage" of $212,000 and that he would "get around $350,000.00 at settlement." (Whiteford Exhibit 5). Debtor further promised to continue making the $500 monthly payments under the January 2007 Loan "until [the] house sells." He offered to have his attorney "draw up papers" granting Whiteford a "second mortgage" on the Fawn Grove property. On the second page of the request, Debtor stated, "I bought a farm in Stewartstown[.] I settle on the 21st of August[.] I want to us [sic] money to begin fixing it up." (Whiteford Exhibit 5). Although not part of the written loan request, Debtor also told Whiteford that the Fawn Grove property was scheduled for settlement in two weeks.

On the day he received this letter, Whiteford consulted with his attorney about the loan request. He asked her to provide information on the outstanding indebtedness against the Fawn Grove property because he doubted that it was worth $629,900 as represented by Debtor. He also wanted to determine the amount of any existing mortgages against the property. His attorney was

4

Case 1:10-ap-00158-MDF    Doc 24    Filed 04/07/11    Entered 04/07/11 13:47:17    Desc
Main Document      Page 4 of 18

able to verify that there were at least two prior liens against the property totaling approximately $300,000.

Having received additional information on the offered collateral, Whiteford contacted Debtor with a counterproposal, which is set forth in a Fixed Rate Promissory Note executed on August 15, 2007 (hereinafter the "August 2007 Note"). Under the terms of the August 2007 Note, Debtor promised to pay Whiteford $102,500 at an interest rate of 5.85%, amortized over thirty years, for sixty days. Thereafter interest would accrue at 17.56%, amortized over thirty years, until the loan was paid in full. These varying interest rates were translated into interest payments of $500.20 a month for two months and $1500.03 thereafter. The principal of the loan was due on August 15, 2010. The August 2007 Note also imposed late charges of 5% on any payment not received within twenty days of the due date. The August 2007 Note was secured by a mortgage recorded against the Fawn Grove property. Whiteford stated that he wanted Debtor to execute a note for the total outstanding debt so that he could obtain a judgment against Debtor if the sale of the Fawn Grove property failed to generate funds to help satisfy the loan.

Whiteford distributed the loan proceeds in two checks, one in the amount of $70,000 and the other in the amount of $10,000. He returned the boat and vehicle titles, thus surrendering these items as collateral for the January 2007 Loan. Debtor endorsed the $10,000 check back to Whiteford, who then gave Debtor cash. Debtor represented that he needed funds immediately so he could make improvements to the property he was purchasing.

As Debtor admits, he did not purchase a farm or any other property in Stewartstown (or elsewhere, for that matter) after Whiteford made the loan. In accordance with the terms of the August 2007 Note, Debtor paid Whiteford $500 in September and October 2007 and $1500 in

5

Case 1:10-ap-00158-MDF    Doc 24    Filed 04/07/11    Entered 04/07/11 13:47:17    Desc
Main Document      Page 5 of 18

November and December 2007.[4] The last payment Debtor made to Whiteford was on December 15, 2007.

On December 18, 2007, First Horizon Home Loans ("First Horizon") filed a mortgage foreclosure complaint against Debtor in the Court of Common Pleas for York County, Pennsylvania, alleging that it was a holder of the first mortgage against the Fawn Grove residence, that Debtor had been in default on the mortgage since August 1, 2007, that the principal balance on the mortgage was $264,571.08, and that the total amount due was $276,847.32. In October 2007, Debtor and his family moved from the Fawn Grove residence to a home situated on approximately three acres of land in Stewartstown, which recently had been purchased by Debtor's mother.

### III. Discussion

The Complaint in the case within is based on 11 U.S.C. § 523(a)(2), which provides that a debt is excepted from discharge if it is:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing –
>
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive . . . .

11 U.S.C. § 523(a)(2).

---

[4] Whiteford agreed to round the payment amounts to $500 and $1500.

6

Case 1:10-ap-00158-MDF    Doc 24    Filed 04/07/11    Entered 04/07/11 13:47:17    Desc
Main Document    Page 6 of 18

Subparagraph (A) of § 523(a)(2) encompasses general claims for fraud, while subparagraph (B) addresses fraud in a writing concerning the financial condition of the debtor. Because Whiteford based his Complaint on subparagraph (B), I will first address this provision.

*(A)     Section 523(a)(2)(B) – written statements regarding a debtor's financial condition*

A claim under § 523(a)(2)(B) must involve the "use of a statement in writing: (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." *Counsel Financial Service, LLC v. Deweil (In re Deweil)*, 2009 WL 1750200, *9 (Bankr. D. N.J.) (citing *(Insurance Co. of North Am. v. Cohn (In re Cohn),* 54 F.3d 1108, 1114 (3d Cir. 1995). "[A] false statement [is] . . . 'material' . . . if it influences a creditor's decision to extend credit . . . [or] if it is so substantial that a reasonable person would have relied upon it, even if the creditor did not in fact rely upon it in the case at hand." *In re Cohn*, 54 F.3d at 1114 (emphasis omitted).

In the case before me, Whiteford alleges that Debtor's August 13, 2007 letter constitutes a materially false written statement regarding his financial condition on which Whiteford reasonably relied and that Debtor intended to deceive him through the representations made in the letter. The specific statement that Whiteford alleges was materially false is Debtor's statement on the second page of the letter that he had purchased the farm in Stewartstown and needed the loan to commence repairs and renovations.

The term "financial condition" as used in § 523(a)(2)(B)(ii) has been narrowly construed to require "[an] accounting of an entity's overall financial health and not a mere statement as to a single asset or liability." *Danvers Sav. Bank v. Alexander (In re Alexander)*, 427 B.R. 183, 195

(Bank. D. Mass. 2010). *See also Douglas v. Kosinski (In re Kosinski),* 424 B.R. 599, 610 (1st Cir. BAP 2010); *Generac Power Sys., Inc. v. Dato (In re Dato)*, 410 B.R. 106, 110 -111 (Bankr. S.D. Fla. 2009); *Bal-Ross Grocers, Inc. v. Sansoucy (In re Sansoucy),* 136 B.R. 20, 23 (Bankr. D. N.H. 1992); *Eugene Parks Law Corp. Def. Ben. Pen. Plan v. Kirsh* (*In re Kirsh),* 973 F.2d 1454 (9th Cir.1992); *City Fed. Sav. Bank v. Seaborne (In re Seaborne),* 106 B.R. 711 (Bankr. M.D. Fla. 1989).

In this case, the August 13 correspondence does not qualify as an "accounting" of Debtor's overall financial health. It is simply a personal letter asking for a loan. Therefore, I cannot conclude that it constitutes a statement regarding Debtor's "financial condition" as contemplated by § 523(a)(2)(B)(ii). Therefore, the debt may not be excepted from discharge under § 523(a)(2)(B).

> (B)    *§ 523(a)(2)(A) – credit extended based on a false representation or actual fraud*

At trial Whiteford set forth an alternative cause of action based on alleged false representations that induced him to loan money to Debtor. Having adduced evidence that Debtor obtained an extension of credit through fraud, the Court will examine whether the debt owed to Whiteford is excepted from discharge under § 523(a)(2)(A).

Fraud under § 523(a)(2)(A) is synonymous with fraud as defined in the Restatement (Second) of Torts. *Field v. Mans*, 516 U.S. 59, 70 (1995) *cited in Dostelaba v. Dart (In re Dart),* 371 B.R. 75, 78 (Bankr. M.D. Pa. 2006). The Restatement describes the elements required to establish a "fraudulent misrepresentation" as follows:

> One who fraudulently makes a representation of fact, opinion, intention or law for
> the purpose of inducing another to act or to refrain from action in reliance upon it,
> is subject to liability to the other in deceit for pecuniary loss caused to him by his

justifiable reliance upon the misrepresentation.

*Restatement 2d Torts* § 525 (1977).

"In order to succeed in a § 523(a)(2)(A) claim, a creditor must prove the following five common law elements of fraud: (1) the debtor made a false representation; (2) the debtor knew the representation was false when it was made; (3) the debtor intended to deceive the creditor or to induce him to act upon the representation; (4) the creditor justifiably relied upon the representation; and (5) the creditor sustained a loss as a proximate result of the representation." *The Bur-Cam Group, LLC v. Pearson (In re Pearson)*, 2010 WL 3956762, *2 (Bankr. M.D. Pa.) (citing *Rembert v. AT & T Universal Card Services, Inc. (In re Rembert),* 141 F.3d 277, 280-81 (6th Cir. 1998); *Fledderman v. Glunk (In re Glunk),* 343 B.R. 754, 759 (Bankr. E.D. Pa. 2006); *Shaw v. Santos (In re Santos),* 304 B.R. 639, 651 (Bankr. D. N.J. 2004); *Webber v. Giarratano (In re Giarratano),* 299 B.R. 328, 334 (Bankr. D. Del. 2003)).

### (1) *Debtor made a false representation*

Whiteford asserts that he loaned new funds to Debtor and refinanced the January 2007 Loan because he believed that he would be paid when the Debtor sold his home in Fawn Grove. But if the funds were insufficient, he would be able to obtain a judgment on the note and enforce it against the new property Debtor was acquiring in Stewartstown. Debtor admits that he did not purchase a farm in Stewartstown after receiving the loan. He insists that before the loan was extended, he told Whiteford he had decided not to purchase the property because it had sustained serious termite damage. He also asserts that he did not intend for Whiteford to receive the second page of the August 13 letter, which referred to the purchase of a Stewartstown property, although he admits that he wrote both pages of the letter on August 13, 2007. He insists that he

9

instructed Tarbert to deliver only the first page of the letter, but not the second page. Simply stated, I do not find Debtor's explanation to be credible.

In any fraudulent intent analysis the credibility of the testimony of the debtor and other witnesses is of critical importance. *Mack v. Mills (In re Mills)*, 345 B.R. 598, 604 (Bankr. N.D. Ohio 2006) *cited in Kille v. Rudski (In re Rudski)*, 357 B.R. 121, 126 (Bankr. N.D. Ohio 2006). Debtor first denied that the second page of the letter soliciting the loan was attached to the first page when it was delivered. If this statement were true, why would Debtor later inform Whiteford that his plans to purchase the property had changed? I find that Debtor did not inform Whiteford before the loan was made that he had decided not to purchase the property and that the second page of the August 13 letter describing the planned use of the funds was given to Whiteford. Accordingly, his representations in the letter regarding the purchase are false.

Whiteford testified that he relied on Debtor's statements and that he would not have extended credit to Debtor had he not believed that Debtor had purchased the Stewartstown farm. He explained that he was not convinced that the Fawn Grove property was worth $629,900 and that he knew that the property was encumbered by more than $300,000 in mortgage liens. Therefore, he demanded an increase in the amount of the interest payments and planned for recouping the balance of the funds by executing on a judgment against the Stewartstown property if Debtor defaulted on payments.[5] Since Debtor's representations regarding the purchase of a farm was a material inducement to Whiteford's decision to extend credit, I find that the August 13 letter was materially false.

---

[5]A judgment on the note would have operated as a lien against any property Debtor owned in the county where the judgment was entered. *See* 42 Pa. C.S. §4303(a).

Debtor's Schedule A filed with his Chapter 7 Petition lists the value of the Fawn Grove property at $231,400, in contrast to the letter's valuation of $629,900. Whether Debtor's overstatement of the value of his home may constitute a "false statement" for § 523(a)(2) purposes is an issue that requires some analysis.

Real estate valuations are matters of art more than science; thus, a representation as to value must be given wide latitude before it may be characterized as "false." *Guaranty Residential Lend. Inc. v. Koep (In re Koep)*, 334 B.R. 364, 373 (Bankr. D. Md. 2005) (for § 523(a)(2)(B) purposes, falsity requires significant exaggeration of property value). Nonetheless, an overstatement of value, by its sheer magnitude, may provide grounds for concluding that the representation is deceitful and not mere "puffery." *See Benjelloun v. Robbins (In re Robbins)*, 178 B.R. 299 (Bankr. D. Mass. 1995) (for purposes of §523(a)(2)(B), debtor's valuation may be materially false if it is so completely without foundation that court can only conclude it went beyond mere puffery); *Posillico v. Bratcher (In re Bratcher)*, 281 B.R. 753 (Bankr. M.D. Fla. 2002) (financial statement overstating debtor's net worth by at least $339,500.00 out of listed net worth of $448,891.57 was materially false under § 523(a)(2)(B)); *Karve Fam. Ltd. P'ship v. Mowji (In re Mowji)*, 224 B.R. 221 (Bankr. M.D. Fla. 1998) (overvaluation of business property at $1.1 million more than its recent $700,000 purchase price was materially false).

In this case, Debtor overstated the value of his property by nearly $400,000. Were this the letter's only misrepresentation, it may have been insufficient to constitute fraud. However, when considered in connection with the false statement that the property was listed with a real estate agent and that it would "settle" in two weeks, is it difficult to draw any conclusion other

11

than the statement had no basis in fact. Accordingly, I find that Debtor's representation that the Fawn Grove property was worth $629,900 was false.

*(2) Debtor's knowledge that the representation was false*

Debtor obviously knew at the time the letter was delivered to Whiteford that he had not purchased a farm in Stewartstown and would not be purchasing a farm. Further, his testimony that he informed Whiteford before the loan was extended that he would not be buying a farm is not credible. Additionally, Debtor knew that the Fawn Grove residence was not for sale on the date of the letter and certainly would not be sold within two weeks. Finally, given the significant disparity between the value of the Fawn Grove property as listed in Debtor's schedules and the value represented by Debtor in the August 13 letter, I conclude that Debtor knew his representation that his home was worth $629,900 was false.

*(3) Debtor's intent to deceive*

Section 523(a)(2) does not require direct proof of an intent to deceive. Such intent may be inferred from the circumstances of the case. *European American Bank v. Launzel-Pennes (In re Launzel-Pennes)*, 191 B.R. 6, 17 (Bankr. E.D. N.Y. 1996) (citing *Driggs v. Black (In re Black)*, 787 F.2d 503, 506 (10th Cir.1986); *First Am. Bank of N.Y. v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 29 (Bankr. E.D. N.Y. 1994); *Hudson Valley Water Resources, Inc. v. Boice (In re Boice*, 149 B.R. 40, 47 (Bankr. S.D. N.Y. 1992)). "A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive." *Equitable Bank v. Miller (In re Miller)*, 39 F.3d

12

301, 305 (11th Cir. 1994) *cited in In re Cohn*, 54 F.3d at 1119 (in regard to a false financial statement under § 523(a)(2)(B)).

In the August 13 letter, Debtor represented that the value of his residence was significantly in excess of the liens recorded against it. Debtor offered no explanation for why the same property he valued at $629,900 in August 2007 was only worth $231,400 in November 2009. "Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation" may produce an inference of an intent to deceive. *In re Miller*, 39 F.3d at 305 (citations omitted); *Ershowsky v. Freedman (In re Freedman)*, 431 B.R. 245, 257 (Bankr. S.D. Fla. 2010). In *In re Launzel-Pennes*, *supra*, the bankruptcy court found that the value of a debtor's residence listed on a guarantee executed in connection with a business loan was an intentional misrepresentation because the value – $385,000 – was "substantially inflated" over the appraised value of $275,000. *In re Launzel-Pennes*, 191 B.R. at 17. *See also Webster Bank, N.A. v. Contos (In re Contos)*, 417 B.R. 557 (Bankr. N.D. Ill. 2009) (debtor's valuation of personal property at $100,000 on loan application was evidence of intent to deceive when property was worth only $23,500)*; In re Freedman*, *supra*, (magnitude of debtor's overstatement of value of business, which he was selling, was evidence of intent to deceive creditor).

I find that Debtor's representations about the value of the Fawn Grove property, the imminence of its alleged sale, and the alleged acquisition of a farm in Stewartstown were all designed to deceive Whiteford. Debtor and Whiteford participated in numerous business transactions. Check cashing was the primary business activity conducted between the parties, but they also engaged in a series of loan transactions. Debtor knew that Whiteford expected collateral

13

for loans extended, and he made representations to create the impression that the August 2007 Note was adequately collateralized or that there were assets that could be pursued if he defaulted on the loan.

### (4)    *Justifiable reliance by the creditor*

Justifiable reliance for purposes of § 523(a)(2)(A) requires that a plaintiff prove that there was actual reliance on a misrepresentation and that such reliance was justified. *Field*, 516 U.S. at 74. Therefore, Whiteford must demonstrate that Debtor's misrepresentations induced him to make the $80,000 loan and refinance the existing loan. "Justifiable reliance is a less demanding standard than reasonable reliance; it requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.' Under the justifiable reliance standard, a creditor has no duty to investigate unless the falsity of the representation would have been readily apparent." *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010) (quoting *Field,* 516 U.S. at 71.) "[J]ustifiable reliance . . . is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Ojeda*, 599 F.3d at 717.

Under this standard, I conclude that Whiteford justifiably relied on Debtor's representation that he had purchased a farm in Stewartstown. He had no reason to suspect that, not only would the funds not be used for renovations, but Debtor did not even intend to acquire a farm. Whiteford knew that Debtor operated his drywall business out of his Fawn Grove residence, and it made sense to him that Debtor would move to a farm and use its out buildings for business purposes. Although he did not demand a lien on the property, Whiteford did regard Debtor's ownership of the farm as an important factor in his decision to lend. Whiteford explained the basis for his

14

Case 1:10-ap-00158-MDF    Doc 24    Filed 04/07/11    Entered 04/07/11 13:47:17    Desc
Main Document      Page 14 of 18

reliance as follows:

> That's why I wanted the note, in case I didn't get paid off in full when he sold the house. I could go up to this farm that he owned, or was buying, and get the rest of it out of that. It had to be worth something.

(N.T. 29). Although he was aware that Debtor periodically experienced cash flow problems, Whiteford had cashed approximately $1 million worth of checks for Debtor and T&T in the preceding three years and did not suspect he was in financial difficulty.

Debtor's representation that he had purchased a farm was important to Whiteford because he knew Debtor's representations regarding the equity in the Fawn Grove property were not reliable. Whiteford admitted that he thought the value of the property was inflated. Although he was under no duty to investigate, he did have his attorney perform a basic lien search, which revealed that Whiteford's mortgage would be in a third position against the Fawn Grove property, rather than in second position. While I am convinced that Whiteford did rely on Debtor's representation that he was about to sell his home, I find that he did not rely on Debtor's representations about the amount of equity he would obtain from the sale. Therefore, Whiteford was not justified in relying on Debtor's implied representations that he would be paid in full from the proceeds of the sale on the Fawn Grove property.

*(5) Loss by the creditor as a proximate result of the misrepresentation*

As indicated above, Whiteford testified that he would not have made the loan absent Debtor's representation regarding the Stewartstown farm. Whiteford testified credibly that he doubted Debtor's representations regarding the value of the Fawn Grove residence and the amount of mortgages that existed against it. His credibility on this point is enhanced by his testimony that he contacted his counsel on the same day he received the August 13 letter in order to corroborate

15

Debtor's representations as to the value and the encumbrances. If he had not been so concerned about the encumbrances on the Fawn Grove residence, he may not have actually relied on the existence of the farm as an additional asset against which he could enforce a judgment lien. Therefore, I conclude that Debtor's misrepresentation about his purchase of the farm along with other representations about when the sale of the Fawn Grove property would occur provided the assurance of repayment Whiteford was seeking and induced him to extend the loan.

  *C. Amount of the nondischargeable claim*

  According to Whiteford's calculations, he holds a nondischargeable claim against Debtor in the amount of $146,396.42. Whiteford's calculations were admitted without objection as an exhibit into the record. In part, his calculations are based on interest accruing on a debt of $102,498.72 as of December 15, 2007, the date on which Debtor made his last payment on the Note.

  As discussed above, Debtor was indebted to Whiteford in the amount of $22,500 at the time the Note at issue was executed on August 15, 2007. Under the terms of the January 7 Note, Debtor was to pay Whiteford the principal on the loan by February 1, 2007 or pay interest of $500 per month presumably until the debt was paid in full. Debtor made the monthly interest payments from January to August 2007. When Debtor wrote Whiteford requesting a new extension of credit, Whiteford agreed to loan Debtor an additional $80,000. The parties eventually agreed that Debtor would execute a note for the full amount he owed to Whiteford and monthly interest payments would be $1500 rather than $500 if Whiteford's debt was not satisfied by October 2007. Accordingly, Debtors misrepresentations not only served to induce Whiteford to loan Debtor new money, it also provided justification for refinancing the existing debt and releasing collateral.

16

"Once it is established that specific money or property has been obtained by fraud, . . . "any debt' arising therefrom is excepted from discharge." *Cohen v. de la Cruz*, 523 U.S. 213, 219 (1998).

The principal amount of Whiteford's claim of $102,498.72[6] is excepted from discharge. Under the terms of the August 2007 Note, Debtor agreed to make payments of $1500 a month in interest charges until the loan was paid beginning in November 2007. Debtor paid interest at this rate for two months and then defaulted on the loan in December 2007. Debtor paid no interest on the loan from December 15, 2007 until the petition was filed November 20, 2009. Therefore, Debtor also is liable to Whiteford for interest for twenty-three months in an amount of $34,497.70. The Note also obligated Debtor to pay a "loan charge" of $7500 when the principal was paid in full. Finally, the Note imposed a late charge of 5% for each overdue payment. With twenty-two payments having been late, Debtor also is subject to late charges in a total amount of $1650.[7] Accordingly, the total amount due under the August 2007 Note is $146,146.42.

---

[6]The amortization schedule for the loan credited small amounts of each payment to principal. Therefore, the balance due on the loan is slightly less than rounded amounts testified to at the hearing. The Court will use the lower amounts submitted in Whiteford Exhibit 10.

[7]Whiteford has claimed as damages daily interest from November 15, 2009 until November 20, 2009. This claim will be denied as it is not provided for in the August 2007 Note.

**Conclusion**

Whiteford has met his burden of proof on all of the elements necessary to find that the debt owed to him was obtained by false representations and actual fraud. Accordingly, I conclude that Whiteford's claim in the amount of $146,146.42 is excepted from discharge under § 523(a)(2)(A). An appropriate Order will be entered.

By the Court,

_Mary D. France_
Chief Bankruptcy Judge

Date: April 7, 2011

18

Case 1:10-ap-00158-MDF    Doc 24    Filed 04/07/11    Entered 04/07/11 13:47:17    Desc
Main Document    Page 18 of 18